Good morning, Your Honor. My name is Robert Ridge. I'm with the law firm of Clark Hill in Pittsburgh, and I represent the appellant in this case, Leonard Young. May I please report, counsel? Before I begin, I'd like to request two minutes for rebuttal. Okay. Your Honor, one of the things that's certainly undisputed in this case is that Leonard Young is a troubled soul. He has been diagnosed since the age of seven with a variety of different mental illnesses and has been treating with those mental illnesses since the age of 11. You can find the full litany of his mental illness diagnoses at page 942 of the record. Mr. Ridge, what's the relevance of mental illness if all that has been raised on appeal is an Eighth Amendment claim as to the September 20th use of the restraint chair? Yes. Your Honor, I believe that the relevance of the mental illness is a question of whether this restraint at this time for this prisoner constituted excessive punishment. Remember that this prisoner has to be treated consistently with his circumstances. And under these circumstances, he wasn't doing anything that would have warranted imposition of the restraint chair. He hadn't threatened himself. He hadn't threatened anyone else. Isn't getting on the roof a threat to himself? I mean, it all worked out. Well, I'm not sure if Young would say that it worked out. Well, it doesn't appear that he hurt himself as a result of that part of the incident, but certainly being up on the roof, I mean, was a concern. I'm sure the court's taken a look at the disks, the video disks that are in this case. He's up on the roof. He's pressed against the observation wall. He's comfortable up there. He moves around up there. And then when he's, after some negotiation, I'll admit there was initially a standoff, but after some negotiation, he complied with the request of the Department of Corrections. He crossed the railing, entered the shower, secured the shower behind him, and presented his hands for cuffing. So under those circumstances, he's no longer a threat to himself. He's not a threat to anyone else. If you listen to the banter that goes back and forth that the appellees have made a great deal about here, he never threatens anyone. In fact, at pages 8 and 18 of the memorandum of opinion that the trial court issues, she identifies the fact, and in Gumbrevich's explanation for why he wants to impose the restraint chair, they identify the fact that others are encouraging him to hurt members of the staff. But he never does that himself. In fact, in the very long exchange that takes place when he's being strip searched, you can hear him. Yes, I will agree, this guy is talkative. He's a very talkative man. He is placed on the floor in the shower hall. He has four people holding him down, someone with their hand on his back, and he's asking questions. What's the basis for us to apply the excessive force test rather than the conditions of confinement test? Well, it seems to me that this is a case much like Zimmerman, Your Honor. And in Zimmerman, the court identifies the reality that sometimes it's hard to tell which one you should apply. In this case, there is force used for the first time, really, when Leonard Young decides that he is going to not walk as fast as the corrections officers are insisting he walk. He went limp, basically. He went limp. That's exactly right, Your Honor. He went limp and they carried him. When they carried him, they used force, and I would submit to the court that they used force when they're holding him down in the shower hallway. Both of those things, it seems to me, really don't give rise to the excessive force claim here until they decide that he's reached the point where they have to put him in a restraint chair. And under the Department of Corrections' own policies, which you'll find at, I think, 631 and 630 of your record, putting him in a restraint chair at that point is entirely inconsistent with those policies. He hasn't threatened himself. He hasn't threatened anyone else. And at that point, he certainly is at a risk to escape. So your argument is not that the length of time that he was in the restraint chair is the constitutional violation. It's that he was put in the restraint chair at all. It's both. It's both, because once you put him in the restraint chair, assuming even that we're wrong and that it's entirely appropriate to put him in the restraint chair, it wasn't entirely appropriate to keep him there for 14 hours. You have in the record the reports by the nurse every two hours she goes in. He's jocular. He's joking. He's having an exchange. He asks her not to exercise him at one point because he falls asleep for hours. Can I just go back and clarify a fundamental point? Below, in the complaint, there are claims that seem to be much broader, that relate to what might more traditionally be considered conditions of confinement, and there was summary judgment granted. Are you on appeal limiting your appeal only to the placement and use of the chair on the 20th? Or does your claim on appeal more broadly encompass any of the other complaints that were raised below, or the September 22nd incident? I think, Your Honor, it's fair to say that our claim is limited to the conduct on the 20th and the 22nd. So the references to the 22nd is by way of example of what other treatment might have looked like? Exactly, Your Honor. Those two claims are also including conditions of confinement. Going back to Judge Greenaway's claim, arguing that the prolonged use of the restrained chair is something that can be looked at as conditions of confinement. I believe that's true, Your Honor, and that is how we're arguing this case, that the prolonged use of the restrained chair amounts to a condition of confinement. I think the Zimmerman court got it right. There are times when imposition of the restraint is an excessive use of force, and then once the guy is restrained, he's in that chair, and that's his confinement. That's the condition of his confinement. If they leave him in there too long, if the circumstances are inappropriate, I think the analysis has to change. But is the restraint, as applied here, inconsistent with Wednesdays in Hope, right? I mean, if we're looking at, you know, was there a deliberate indifference to the inmate's health? Well, you just mentioned a moment ago that, you know, medical staff was in there every couple of hours. They were checking up on him. He was jocular, so you would think the answer is apparently there is no deliberate indifference to his health. And then there's the question of the risk of harm. If he, you know, no impending battery on him or assault on him from the beginning of his time in the chair until the end of his time in the chair. So the conditions of confinement test doesn't seem to be amenable to the claim. I'll acknowledge that there are references in the condition of confinement case law that says, essentially, as long as you're taking care of him physically, then he's certainly not. The Constitution isn't being violated. It is not. I haven't seen a case yet that says the condition of confinement can't or shouldn't take into account the guy's mental health. Counsel, I understood your argument to be that this was not a conditions of confinement case, that we were looking to excessive force and the test for the use of excessive force, and that that's what we should draw from Hope. Is that not the case? That's right, Your Honor. That isn't the case. As I explained to Judge Greenaway, what we were looking at is two, really, the trajectory of these facts essentially puts the case in both. He's submitted to the restraint chair at a time when he isn't doing anything that satisfies the Department of Corrections requirements, and that certainly putting him in there is a use of force, and if it's excessive at the time, then it's an excessive use of force case. Then he's kept there. It seems to me you have to do the analysis under conditions of confinement for having kept him there. I share Judge Greenaway's concern how that's consistent with Hope, because Hope, although it makes a reference in the general discussion of the Eighth Amendment to deliberate indifference, is applying a test for unnecessary and wanton infliction of pain. That is exciting repeatedly to Whitley. So both its analysis and its conclusions in terms of the application, including the length of the use of a mechanical restraint, are an excessive force analysis. Why would we be looking to conditions of confinement? Well, our circumstance, it seems to me, is distinguishable from Hope, as the Court understands, because in Hope, the guy, his outburst happened at the work site, and they take him back on the bus and eventually take him off the bus there and strap him into the hitching post. So from my point of view, I understand that the Court, and frankly, I'm confused about the analysis that the Hope Court is using. I don't think they make this distinction at the Supreme Court level that we're making. But I, so frankly, what I wind up doing is relying on Zimmerman and the language in that case to say, well, listen, there are two different kinds of confinement, and we have to analyze it under both. Your argument that you've just posed to the judge's question seems analogous to this situation in this respect. You're saying that there's an outburst by Hope, which leads to the reasonable application of force, which is why the test wasn't satisfied from the plaintiff's point of view in that case. Or it was, I'm sorry. But here, the prison officials are taking into account that Mr. Young is a troublesome person, and he has been a consistent or consistently misbehaving is probably the nicest way to put it. There are two points on that, Your Honor. Number one, in Hope, the analysis with respect to the restraint, it seems to me, is confusing because there isn't any disturbance at the time they bring him back. My recollection of the Hope facts is the guy actually works before they bring him back. He complies and he works. Then they bring him back and hitch him to the hitching post. So the exigencies that would ordinarily meet a restraint in order to sort of quell any disturbance aren't present. But isn't that exactly your argument, that this is a case like Hope or like Giles and unlike Fuentes, where there's actually been a break in the action? I think that is my argument. So that the excessive force test is really the one that is the stronger one for the argument that you're trying to make. Conditions of confinement is a very high standard. No, I understand that, Your Honor. And I do agree that the excessive use of force test could be applied in this case. The problem is that I haven't found any case that says that the use of the restraint chair for extended periods of time, other than Hope, which as I told the court I found a little bit confusing, other than Hope that say, okay, that's a problem. And so from the point of view of the – but I can tell you that under the Department of Correction standards, certainly he should have been released earlier and this is an excessive use of force. But that doesn't give you a constitutional claim. It might give you an administrative remedy of some sort. How would you distinguish this from Fuentes? First of all, the reason this is distinguishable from Fuentes is Fuentes is a decision after trial. This is a summary judgment grant. Well, the relevant provision of Fuentes that dealt with the substantive due process claim as opposed to the 14th Amendment procedural due process claim, that was an affirmance of the magistrate's recommendation and the ultimate grant of summary judgment. That claim, which is the substantive due process claim you're in essence bringing here, that was summary judgment. So why was that not even cited in your brief? Well, I don't know that Fuentes isn't cited. We certainly – Fuentes has been a case that's been cited by one of the parties in this case. The issue for – we don't have a procedural due process claim in this case as far as I know. My recollection is we just have the Eighth Amendment claim. And so from our point of view, I'm not sure that Fuentes, at least in that analysis, applies in our case. I could be wrong, but I didn't see that Fuentes was really – because it was a decision after trial, I didn't see that Fuentes was a case that would really guide us in this instance. And frankly, I – a lot of these kids are running together on me, so I don't remember what exactly Fuentes did, but I remember that Fuentes was a situation where he was incarcerated pending sentencing. That was the majority of the notices that had to be used because he was a – Yes, it was a different test to be used because he was awaiting sentencing. He had not yet had a judgment and conviction entered against him. But the test was the same. We know the test was the same. And that seemed to me to be the issue, was whether the test should be the same under those circumstances. So getting back to the point that Judge Greenaway made earlier, the difference between this case and those cases is essentially that this is a summary judgment case. If you look at page 7 of the memorandum opinion in this case, you'll find it in the record. Page 47, the district court says – well, the trial court, because we've agreed to have the magistrate give the case. Thereafter, summary judgment briefing was completed and defendant's motion is now ready for disposition. Unless otherwise indicated, the following historical facts are not disputed. Although competing inferences arising therefrom and conclusions drawn by the parties are widely at odds. Now, then she proceeds to go forward and draw every inference against John. And it seems to me that those are the circumstances that really cause a concern for us in terms of – What's the key disputed fact that should lead us to reversal? The key disputed fact really is a question of whether it was appropriate to put him in the restraint chair in the first place. Was it that or the duration of time in the condition in which he was kept in the restraint chair? Because he didn't have his real clothes on. Well, yes, I agree. I mean, certainly the conditions of confinement are things that are problematic. But it seems to me if you never put him in the restraint chair in the first place, he doesn't – you don't confront those issues. If you had to put him in there for 15 minutes and then let him go, or as they did in the 22nd, put him in the restraint chair and transport him to the cell, he wouldn't be here. Exactly, Your Honor. I don't think he would be here. You don't have the kind of harm that you would necessarily have. What should we do about the absence of – I put injury in quotation marks. But there's some language in front of us that suggests that absent injury, we never get into this amendment analysis. I think the same language is there in Brennan. I'm not sure. In this case, I think Young has demonstrated at least some level of injury. He's testified that when he was released from the restraint chair – this is in his affidavit – his arms and his legs are numb, his shoulders hurt, he can't stand up, he can't get back to his room, he has to be assisted. But he's been medically cleared, no? He's been medically cleared of any immediate injuries, absolutely. He needed no treatment at that point. He just had to deal with the condition of being in a restraint chair for 14 hours. I'm sorry. I don't want to be dense about this. But if there's no medical evidence of injury and essentially what you've said is that he felt numb, what's the injury that creates a genuine dispute on that? What's the issue that creates a genuine dispute about whether he had an injury? I don't really think there is. I think the question – I don't know that the attendees have disputed that he was in that condition when they took him back. He indicates there's scrapes and cuts and things along those lines, but the reality is those are relatively minor injuries. The real issue is what happens to a person when you put them in a restraint chair for 14 hours. Again, this is an instance where, in Young's case, the real problem is we're looking at it from the point of view of physical injury. And that's why we requested the right to retain a psychiatrist to discuss the impact of this on him mentally. On that point, Mr. Ridge, our case log precludes the use of expert funds under Rule 706. You cite two apportionment cases, but there's no issue of apportionment here. Did you make an application under 18 U.S.C. 3006 A.E.? I believe we just applied under Rule 706, Your Honor. Are you retained or appointed under the Criminal Justice Act? Appointed. And by the way, it really didn't matter to me whether the psychiatrist was appointed to assist the court or to assist us. And the court certainly has the power to appoint the psychiatrist to assist the court under Rule 706. Under these circumstances, it seems to me that it's abuse of discretion not to do that, since she has the report in front of her, which is supplemented, the record from the Crescent Review by the Department of Justice. But isn't the right vehicle for a CJA counsel to seek expert appointment at that section of Title 18, 3006 A.E.? Even without court authorization, up to $800? And with an ex parte application? Your Honor, I'm not sure that I'm covered. I could be. But I'm not sure that I'm covered under the CJA act, because I'm not being paid for this. This is a pro bono retention. And I was asked to step in and take on Mr. Young's case by the district court here. So this is being done pursuant to a, as I understand it, a local program where certain inmates whose cases get beyond a certain level are asked, people like me are asked if you would step in and represent their interests for free. And, frankly, to do that, I have to agree not to ever seek any fees in this case. So there won't be any request for fees under the Criminal Justice Act, and there's no request for fees under 1983. So if we go back to the very first question then that Judge Krause put to you about his mental state being an issue, your point is you weren't able to develop the creation of a dispute effect on injury because you didn't have the opportunity to have a medical professional examine him.  Yes, that's exactly right. I thought you were, in a sense, relying, because we're talking here more emotional and mental injuries than physical injuries. Physical injuries don't rise to the level of an Eighth Amendment violation, or they don't get you into jail under conditions of confinement. I thought you were relying upon the influence that arises in a motion for summary judgment as to what would naturally flow, the kind of injury that would naturally flow, the emotional and psychological injury from being put in a restraint chair for 14 hours with no clothes on. I think that's right, and it's not as if the court has no evidence of that, because she is advised by the Department of Justice in the supplemental report that we submitted that, yes, this has adverse effects on the mental health of the inmates who are incarcerated this way and where the restraint chair is used in exactly this manner. Now, I'll concede it was Crescent and not Green, but that was just a matter of time. Well, when we're talking about the report in question, at this point whether the district court has used discretion in refusing to grant a stay for the final report is really moot, right? Because if we were to remand, at that point the district court could consider the final report. I think that's right. It's not an issue. There's no question. If this case gets remanded and reversed and remanded, then the court's going to have to deal with the issue of the final report because it's out there. So going back to the question of relevance, I shared the Chief Judge's confusion on the use of it. I had understood that you were also trying to make the argument that a legitimate use of the chair includes control and protection of the inmate and others for safety reasons, that accounting for his psychological condition, showing that the use of the chair here, given what the prison and these officials knew about his mental condition, that it wouldn't contribute to future control or safety, that it wasn't necessary and appropriate given his mental state. Well, that's true. I think that's true. There's no way that he's going to conform his behavior based on it being put in the chair. So the court is right about that, but I don't think that that eliminates the possibility that he might actually have been damaged by being placed in the chair as well. Thank you. You saved some time for rebuttal. Good morning. May it please the court. Kamal Alexander Marichli for the FLEs in this case. I'd like to begin with all humility to express my understanding of the applicable test that the court should look to in considering this dispute. And it's my understanding. Under which claim? Eighth Amendment or deliberate indifference? Deliberate indifference. And I suggest that that comes from Hope v. Pelzer. I say deliberate indifference. I mean conditions of confinement, which is deliberate indifference. Conditions of confinement is deliberate indifference. And I suggest that that comes from Head Note 4 on Hope v. Pelzer, which makes it quite clear. It says the determination of whether punishment is cruel and unusual is made in the context of prison conditions by ascertaining whether the prison officials involved acted with deliberate indifference to the inmate's health and safety. And then they cite in the text to Whitley v. Albers. Now, there's no mention or any analysis in the Hitching Post case, Hope v. Pelzer, of an excessive force test. What I found interesting is this court's opinion authored by the chief judge in Fuentes v. Wagner, which was two years earlier than Hope, a 2000 decision. I read that, and I discussed this in my brief using a textual analysis. I read that as, in effect, presaging Hope v. Pelzer in saying that a restraint chair situation, which is comparable to the Hitching Post and Hope v. Pelzer, is best analyzed under a condition of confinement deliberate indifference test. Although the court went on in Fuentes to then analyze it as well under the excessive force case, but it did so in the alternative. So I suggest that the leading, again, with all due respect and humility, I suggest that the leading case for this court to begin its analysis of the current dispute is its earlier opinion in Fuentes v. Wagner. How long was the restraint in Fuentes? Eight hours. Was Fuentes clothed or unclothed? Fuentes was clothed. So making a difference here, we've got 14 hours with somebody who's basically naked. You refer to this as loincloth. I call it loincloth. You don't. But to make a difference, you've got somebody in a restraint chair for 14 hours with no clothes on versus who's checked every two hours. In Fuentes, I think they said they were checked every 15 minutes. And the arms were actually, as I recall it, and I've got the thing in front of me. I don't want to take time to go back to it now, but they would release part of the restraint. It looks like on one side the nurse would actually manipulate that arm, put that arm back in the restraint, and then to the other side every 15 minutes or so. Here we've got to be two hours. Yes. All those things are true. And the sarong or the loincloth is also a distinctive difference from Fuentes. And that doesn't make a difference. You take somebody and put them in a restraint chair. And I don't know if the restraint chair you're using here is the same one that was used in Fuentes. It's the same department. I assume it is. I can, in all honesty, see no material difference. Okay. Have you seen what that chair looks like? Oh, yes. I tried to imagine sitting in that thing for 14 hours with my arms, torso, waist, and ankles strapped so that they were totally immobile with no clothes on. Well, that doesn't get to deliberate indifference. I'm having a problem thinking about what is deliberate indifference. I mean, you do argue, I think, in your brief that they could have shot him. You said, well, they could have done something more. They could have done more than they did, which I thought, well, yeah, you're right, they didn't shoot the guy. Well, they also, I think, in all fairness to my clients and to the Department of Corrections, I think if you contrast, as I know you've looked at the DVDs, if you contrast their deliberate, calm... What about the laughter in looking at the DVDs? We've got this reportedly dangerous, constantly dangerous, acting out inmate for 14 hours. I've seen those tapes several times, and I never saw any laughter. Did you hear any? I didn't hear any laughter either. I don't know if you have the same ones that I have. Counsel, the video reflects that he's on the roof for approximately seven minutes. That's correct. And the two guards that are next to him over a period of about four minutes seem to be chatting with each other and joking and laughing during that period. Oh, with each other. Yes, I do understand that. I misunderstood. I thought you were talking about the time when they were holding him down on the floor, subjecting him to a strip search. No, it seems to me the only time that may be okay under summary judgment is the time when he's being held down on the floor and strip searching. I guess arguably you could say that once he's out of the cell, the COs for their own protection have the right to make sure that even though they didn't see him acquire any weapons, they've got the right to strip search him to make sure that while he's out of the cell, he didn't acquire anything. So the strip search seems to me the most defensible of all of this. But once he's strip searched, it's clear he doesn't have any weapons on him. To then put him naked into a restraint chair for 14 hours, arguably is a lie. And the other thing that is confusing here, especially for summary judgment purposes, as Mr. Bridger argues, the 22nd, which seems like a more potentially troubling and threatening situation, to me, and I'm no expert on chronology, that's for sure, they put him in the restraint chair and used that to transport him to the cell. To me, that's exactly what the restraint chair should be used for. It's got wheels on it. You put him in there and you're safely in the cell where he can't hurt any of the guards, can't hurt himself. Once he's in the cell, you secure him in the cell. You don't leave him in the chair for 14 hours with no clothes on. Well, that's why, Your Honor, I tried to survey the general law involving disruptions within the prison and the response by prison staff to disruptive, dangerous conduct by the inmate. Now, I don't think that the- You're putting a lot of rabbits in the head there when you say it is disruptive, but there are all kinds of disruptions. And this is clearly not a situation where it's not adequate, which is clearly, that's a disruption. This is a disruption that seems to me as the total opposite end of the disruption totem. You've got one person you say in your brief he escaped from a cell, but in the video, the door is open, he goes out, looks around, goes back in, it looks like he went back in to get his shoes. He comes out again. Yes. Technically, that probably is escape. If someone walks away from a halfway house, that's escape. I guess you could argue he escaped from a cell, but it's- When I read your brief, I had a very different image than the image that I had after looking at that video. Well, I invited you to look at the video and ensure that- I mean, that's our view of the video. That was the district. Pardon me. The district court's view of the video. I think it's important to realize, as in Fuentes, this took place- In Fuentes, it was a behavior adjustment unit. In this case, it was the restricted housing unit. There's a critical mass of recalcitrant incorrigible inmates there. They were all pretty secure, it seems to me. They were all secure, but, I mean, there's a question of the atmosphere that's going to be created and the- What's the disturbance after a strip search is done? The inmates are not in jeopardy. He's not in jeopardy with regard to his own sort of safety. The guards aren't in jeopardy. So it leads one to believe that the placement in the chair restraint is punitive, and I'm not going to argue whether it's within regulations to allow it. But the question that the chief put to you is one that I'm grappling with, and that is eight hours in Fuentes, 14 hours here. If there's no safety concern, if there's no contraband concern, you'd agree at some point, right, you would prevail the line. If you don't think it's 14 hours, there must be some period of time that you would agree under these circumstances it would be too much. Yes, and they thought it was 12 hours, and that's when he made an insolent remark using the curse that if he was let out, he would just go right back and do what he did. Well, he couldn't do that because you wouldn't open up the door at night time. Yes, you would. Who the heck would ever open that door at night? Oh, you baited him. As is frequently the case in life, history goes back and finds a very mundane situation. The intercom for the communication system used by the officers in the bubble had a button that was directly next to the door unlock situation for Mr. Young's cell, and eventually they had to call an electrician and get it put on the other side of the room so that every time somebody wanted to say what's for lunch in the cafeteria, it would open the cell. A lot of open cells. Yes, but we're still we've had some jocularity, which is great, but you haven't answered my question. The question is you asked me, Your Honor, that at some point the line has got to be drawn. We can't keep them in this chair forever. Doesn't 14 hours seem like it's way over whatever line it would be? And particularly when we, none that I can discern, maybe my colleagues can discern, where's the disturbance? When I think of disturbance in these contexts, I'm always looking at who's in danger, and if someone's in danger, absolutely, they'll attack reasonably and so forth. I don't see it here. With all due respect, Your Honor, the only evidence I can point to in this was Captain Gumborevich had said, or Gumborevich had said that, and one of the others, Lieutenant Kirby, had said this was a completely unprecedented situation. We had never had anybody get up on the roof before. It was dangerous to him. It was dangerous to others. He's off the roof now. Yes, yes, but under the circumstances, he had caused an atmospheric disturbance, at least within the RHU, and I apologize again for not understanding you were referring to the two men waiting for him, trying to talk him off the roof. But there was an atmospheric disturbance, you know, from having looked at that, that a lot of people were yelling and screaming, and they were urging him to attack the guards, which I remember seeing. But this is not a library or a monastery. No, it's a horrible place. I have not been in this institution, but I'll take your word for it. Yes, it is. But I'm not sure there's evidence like that. It's a place where we hope, in terms of justice, we can justify at the end of the day that people's own conduct, behavior, and choices have put them there. That's what allows it to be something that happens in America. And that's what we're looking at here. The response to a disturbance, unlike the initial imposition of judgment after conviction, you would agree that the response to a disturbance in prison under our Eighth Amendment test cannot be for punishment. Absolutely, nor can it be for deterrence. It can only be for purposes of obtaining control over the individual for purposes of ensuring that he's no longer a danger to himself or others. How do we get from zero to 12, Dan? How do we get from zero to 12? Twelve, you say, you know, he's insolent, and so he deserves the other two hours. Great. Let's forget about 12. Because insolence, to me, that suggests punishment or we're going to teach this guy a lesson, not security. Go ahead. So we go back to my point, which is if there's no evidence of disturbance after the strip search, I mean, right, he doesn't have any weapons hidden somewhere, right? I mean, we all see him naked, right? He's not presenting any potential harm. He's safe. The prisoners are safe. The guards are safe. Then what could this be other than punitive from hours zero to 12? My answer to your question is, and I was attempting to, I think, myself, lead to it with Captain Gumbarevich's remark, and that was they were concerned that if they brought him back to the RHU right after this, and I understand you have to compare this with what they did on September 22nd, but on September 20th, the way they were reading the play was they decided that we can't bring this man back, we can't bring Mr. Young back to the RHU after all this, at night, when he's created such a level of atmospheric disturbance and disruption, when he's demonstrated such a level of disobedience and recalcitrance. Why not? Why isn't that just punishment? And we have, as I understand the facts and the record, after the seven minutes on the roof, where he doesn't make any threats during his seven minutes on the roof, right? He just, he complains about prison conditions. He complains about prison conditions. Yes, he makes no threats. He's then coaxed off the roof and comes voluntarily, follows their instructions to go into the shower and allow himself to, through the slot he's shackled, inside the shower door where he's already secured. Yes, Your Honor, but then he becomes, he engages in passive resistance where he refuses to walk. To me that's the opposite of being violent. He just goes limp. Yes, and then they ask him at the bottom of the steps, will you walk now? And he says no. He makes no threats. Just like the reason they had to give him a sarong or a security wrap or a loincloth, because he wouldn't stand up for them to put the smock on. He makes no threats during that time either. No. Right? No. He makes some vague threats, I think. It's more like disparaging remarks like, you men are cowardly for dealing with me all in a group like this. You're not contending that's a threat? No, but he does make some remarks that indicate. It's pretty mild given some of the chatter. It's mild, but it does indicate some reference to aggressiveness and force and violence. He's kicked off. He's aggressive. He looks like a. . . He's good. He is the can of paint. He's a can of paint. He's just sitting there. Not surrendering and running up a white flag entirely. I do argue qualified immunity in this case. That's a different issue. Yes. He has a strip search where he's shackled both his arms and his legs during the strip search. Correct. Right? And he's prone on the ground and naked. Yes. And this is 15 minutes since his remarks on the roof where he's made no threats. Yes. And there's been no violence by him. But I do point out, Judge Krause, that in Fuentes, this court emphasized that the very fact that a group of corrections officers are holding somebody down and he is cuffed and shackled do not necessarily count in and of themselves as him having returned to self-possession and self-control. Fuentes was a continuous course of conduct. He was taken from the cell where he had attempted to assault an officer. Correct. And immediately from there into a chair. It was a continuous course of conduct and response. Here there's a break of 15 minutes where there's not been any assault. There's no threat. There's no violence on his part. So where is there a risk to safety of himself or of others at the end of that 15 minutes under those circumstances? I can only point to the perception of the facts that you've described by corrections officers in charge of the situation at the RHU at that night. They thought that they still had an out-of-control individual that needed to be restrained in the restraint chair before they could be assured that he could be returned to the RHU. Is it your contention that the videotape reflects an out-of-control individual? I think it certainly reflects an individual whose initial behavior was extremely dangerous, out-of-control, and a threat to the institution. When he was up on the roof in the lobby, I don't consider that... He's not really a danger to himself up there because he slips and falls. Pardon me? He's on the roof up there and no one's near him. He's only a danger in danger of slipping and falling. I mean, it's not like this guy's wielding an AK-47 in the middle of the yard. Of course not, Your Honor, but they were afraid he might jump on them. And then run down. They say that. So really, as long as he was up there, I think I must respectfully insist that there's a perception that he's a danger to himself. I understand that. That's seven minutes. That's seven minutes. Okay. Then he's off, and then they are so, and then he's vocal, he's verbal, doesn't make any threats, doesn't throw any punches. He's limp. He's limp. You've been doing these kind of cases for a little while. This guy is very tame compared to some of the cases that you've been before this court on. I mean, you know, a lot of the folks, every other word is a word that can't be repeated in these confines. I mean, that is not the case here. I understand, Your Honor. That's part of the reason why I tried to utilize the brief to survey the law as carefully as possible to give you a basis for the application of appropriate tests, to look at the McCullen case where one of your district courts had surveyed all the federal district courts and came up with a bright-line rule that anything under 24 hours shouldn't be a problem. Those are the things. You would agree that in this case, if he was kept 24 hours, at least some part of that would have to be punitive. Absolutely. I mean, they absolutely, it's impossible to justify 24 hours here where they're ready to release him after 12. Okay. Okay. Mr. Snelly, I'm interested in the prison's policy because one of the things that the court, and of course it was Chief Judge McKee's opinion in Fuentes, looked at there was compliance with policy. So is there a policy in this prison that there's a maximum of eight hours in the chair without authorization by the facilities manager? That's correct, Your Honor. And where is that policy? That's a policy that's reflected in the reports, but it's not a policy that's in the DCADM policy guides. If you could look with me at Joint Appendix 338. Yes. There's a form there, an authorization form. I beg your pardon. Yes. Yes, Your Honor. And there it has, on the right side, restraints your eight-hour maximum unless approved by the facilities manager designee on the form that's checked off. Is there someplace that you're aware of other than this form that reflects the policy of an eight-hour maximum? No, Your Honor. And below that, it has a provision for restraint chair with meaning of medical staff and member date, and there's nothing signed there in terms of approved or disapproved. Where on this form is there authorization by the facilities manager or the designee to keep them in the chair for 14 hours rather than the eight-hour maximum that's stated here? There is not. And where is there any documentation of that authorization? I can't recall. I don't believe there is any authorization like that. I believe that at some point in the record, you have Captain Gumbereck was the person to authorize the use of the restraint chair. I believe Lieutenant Kirby, this is all through the reports. I believe Lieutenant Kirby contacted him. He was the shift commander. He authorized it. Then at some other point, it's indicated in the same types of documents that he contacted Deputy Facilities Manager Mark to indicate that they had him in the chair. That's all I recall. I believe I studied the record carefully. I do not think there's any further information, and I don't think there's anything other than this form that talks in terms of a specific hour limitation. It is reflected in those reports that there's a chain of command for notifying people, and the ultimate authorization is by the deputy superintendent. That's it. What evidence is there that that authorization of the facilities manager or designee was sought in advance of 14 hours in the chair? There's no evidence of that. I believe we can say there's no evidence of that. In Joint Appendix 180, there's a picture of the chair, and it looks like some instructions. Is that, in fact, the chair that is in question here? I believe so, because I believe we provided that in discovery. That's before restraint. Yes. And if you notice, it does say the manufacturer suggests the recommendation is two hours. Yes. It says that DT&E should not be left in the chair for more than two hours. And the DOJ report, Your Honor, as well, says seven hours. So nothing besides McClellan versus Rouse. Magistrate Judge Carlson's report, or yes, it's a report recommendation in that case that surveys the law, would indicate there's any basis in regulations, in reports, in the manufacturer's recommendations, or anything for anything in excess of seven hours. And I can only imagine that the eight-hour limitation is some form of administrative limit that's emerged at SEI Green based on the idea that at some point, when we think of all the information that I've just adumbrated, eight hours seems like you're going beyond any types of ordinary indications of use. And to answer your question directly, is there anything here that indicates at some point my clients or anyone else sat down and said, look, we're going beyond eight hours. Let's make sure we put together some real documentation and some real decisional memoranda on that. No. There isn't anything. I'd like to go back for a couple of minutes, if my colleagues would indulge me, on what test we ought to be using. You have referred to Fuentes, but recognize that Fuentes predated Hope. Yes. Why doesn't the language of Hope, which refers to Whitley and Hudson, which are clearly excessive use of force cases, why doesn't that dictate what test we should use here where there's been a disruption? I mean, Hudson said explicitly, we concluded in Whitley that application of the deliberate And he also said that in different standards it's inappropriate when authorities use force to put down a prison disturbance, whether it's a riot or something lesser. And instead, the question is whether the measure taken inflicted unnecessary and wanton pain and suffering that ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. That's the excessive use of force test, and that's referencing this test in Whitley. Hope identifies the question that it's addressing as whether there was unnecessary and wanton infliction of pain and then reaches the conclusion, based on the disruption by the prisoner in that case, the break in time, and then the use of mechanical restraints, that the Whitley test is appropriate, that it's unnecessary and wanton infliction of pain. And we, following those cases in Giles, where there was a disturbance in the shower and what followed was physical force that was used, we applied an excessive use of force test, not a conditions of confinement test. Why, following Hope, would we still be looking to conditions of confinement? Perhaps I misread the case, but my understanding of it was, if you read it at Head Note 4, and there is no discussion of the excessive force case at all in Hope directly, I understand your point about how its authorities in fact use the excessive force case. But on page 737 and 738 of 536 U.S. Reports, where it appears, the court says, in making this, we have said that among the unnecessary and wanton inflictions of pain are those that are totally without penological justification. Citation to Rhodes versus Chapman. Oh, here it is. At the beginning of the paragraph it says, the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Whitley v. Albers. We have said that among the unnecessary and wanton inflictions of pain are those that are totally without penological justification. Rhodes v. Chapman. In making this determination in the context of prison conditions, we must ascertain whether the officials involved acted with, quote, deliberate indifference to the inmate's health or safety. Hudson v. McMillan. We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. Farmer versus Brennan. So my reading of that, of course, I submit to the court's greater wisdom on this subject. My reading of that, that's where I got that idea. But doesn't it go on to actually conduct an analysis under Whitley and Hudson, that is, at the end of page 738, concluding that the punitive treatment there amounted to infliction of wanton and unnecessary pain, and then repeats again, citing to the Whitley test later, that the use of the hitching post as alleged here was unnecessarily and wantonly inflicting pain. And my reading of that was that they subjected that interpretation to the concept of deliberate indifference. But Hudson says that these are different tests and it's inappropriate to use conditions of confinement in a setting of a prison disturbance. And Hudson is cited here. Are you suggesting that this is somehow silently disapproving or modifying Hudson? I'm suggesting that you've put your finger on something that indicates a level of confusion that should have been clarified. I don't think, on the other hand, that they went through in Hope v. Pelzer the five-point test, the need for the use of force, the relationship to the amount of force used, the existence of injury, the extent of the threat, the efforts to temper the severity of the threat, the duration, or any of those considerations. I think the reason I thought Hope looked like this case is because there was a break between the time he was brought off the roof and the time they put him in some form of a restraint. The difference I thought that I saw between this case and Hope is it's quite obvious in Hope that they were just pilloring the guy and giving him an exemplary punishment like out of Spartacus where they brought everyone past him on the way back to the cell block so they could see what happens to people that disobey them. In this case, I thought we didn't have anything like that. I thought, as did the district court, that we had a situation where they were so concerned after the guy behaved in such a bizarre way in the middle of the RHU that they felt the only thing they could do to pull him off and be sure that they could bring him back in a way that wouldn't set the place off again was put him in this chair. And I understand that they kept him there a long time. But you would agree then that either test applied, if we find that the placement in the chair was punitive, you'd lose under either test. Absolutely. I don't think it's a difference in outcome either way. I think we have to satisfy both tests. And I think in order to assure the court that the Eighth Amendment hasn't been violated here. And I also think we can. And I hope my briefs demonstrated that. But if not, and in Fuentes v. Wagner, the chief judge's opinion for the court does look at both tests. And one of the ways I read it, it's a privilege, as I say in my brief, that deliberate indifference test is a way of looking at a restraint mechanism, is that that is in fact what it does. Because then later the opinion of the court in Wagner goes on to say, assuming that the excessive force test applies, here's why, in Fuentes v. Wagner, it's not violated. It's confusing because it states one doctrine and then uses the language of the inquiry of the other doctrine. The Eighth Amendment uses the language of conditions of confinement to get into the Eighth Amendment discussion. I found it also very confusing. In all fairness to Judge Prowse, and with every respect, I understand her position. I had read it, but I do say in some defense, superficially, it does say let's apply deliberate indifference test. But now it seems that it says let's apply the deliberate indifference test, and the authority for doing that is a bunch of excessive force tests. So, you know, I didn't read it that closely, but that's in fact what it says. However, in terms of the dispositive nature of this case, if we can't satisfy those tests, then we have an Eighth Amendment violation. But I will make one last effort to tell you that my clients, I think, did their best. They worked in a legal landscape where you have people telling you 24 hours is okay, at least constructively. You have a situation where they, aside from those two individuals that were engaged in some form of batonage while he was up on the roof, the entire time they actually dealt with him in a hands-on way, they were restrained, professional, careful. They did not degrade or make fun of him or do anything like that. If this is a case that the court perceives a necessary rule limiting the use of restraint chairs, I would hope that they would still enjoy qualified immunity in view of the atmosphere in which they took these difficult actions. I appreciate that. Mr. Rich's argument, I think, is that that may be true, except for qualified immunity. That's not a jury issue. But it may well be that a jury should determine the professionalism, the appropriateness of the response when given the appropriate standard. Thank you, Mr. McPherson. One other question that perhaps we can also hear from Mr. Rich on. As to the DOJ report, now that it's issued, is that something that, do you agree that's something that we can take judicial notice of? And if we ultimately don't affirm but reverse and remand, is it something that you contend the district court can't consider under Rule 803-8A, and so why? Yes. I have made an argument in the brief that this report is not admissible under Rule 803-8A-3 because it is neither an investigative report directed to this specific incident nor an adjudicative report that emerges out of this particular incident, that it speaks in terms of generalities and it makes general statements, that some of it is necessarily not based on conduct at green, this particular institution, that to the extent, referring to Rule 403, that it relates to other bad acts at other places. It also relates to other bad acts at other places by other people, not my clients. And as a result, it would be unduly prejudicial in the form of the other bad acts evidence. Now, I don't know to what extent that aspects of this report may be trimmed out of it and would constitute relevant evidence in any particular juncture or could be used to impeach witnesses or to otherwise provide a basis for impeaching an expert or something along those lines. But as for the report itself in response to your specific question, no, I don't think it's admissible. But to the extent it includes data and factual finding from an investigation as to the use of the restraint chair being excessively long and routinely used at SDI Green, among other institutions, to inflict punishment, why would that not be factual findings from a legally authorized investigation where neither the source, the information, nor other circumstances indicate a lack of trustworthiness? And that's not going to get you a fee, but it's the initial question of judicial notice, which you really didn't answer. You answered because the rules specifically applying to these kinds of reports you're advocating, it's not admissible. But what about the initial question of judicial notice? I don't think you can take judicial notice of something that could be a disputed fact. And my answer to Judge Krauss would be that I don't think, and I would argue to the trial judge, or if you were sitting in that capacity, I would argue that in fact it's not clear how much of it applies to Green, what specifically applies to Green, and what can be said about it, except it's a general statement. It's qualified by things like often, routinely, indicating. It's got to go to the appropriate value of it, not its admissibility. I would suggest that it, I would object to it on those grounds by saying that it's overly general and does not reflect, as Judge Krauss inquired, it does not reflect specific factual findings that would be pertinent and relevant to a dispute involving these particular individuals in this particular event. I would suggest, though, that if they would call an expert, that this would be the kind of thing on which an expert opinion might be informed, or if we would call an expert, this would be the kind of thing on which it would be informed, and that man or woman could be subjected to questioning on the basis of this type of material. But you've argued that they aren't entitled to any funding for an expert. That's correct. I haven't argued that. That's Tavern versus Grace, which is the opinion of this court, again, is that ... The thing about that is there's an interesting case that I did not find in time for my brief, and that's called Montgomery versus Pincheck at 294, Fed Third 492, Third Circuit 202, and that's one of the progeny of Tavern versus Grace, along with Farm versus Johnson. And that says, as you know, one of the six factors that a court looks at in terms of exercising its discretion to appoint counsel in a civil rights case. And my learned opponent has pointed out the limitations of that. It's not like the Criminal Justice Act. Unfortunately, Gideon versus Rainwright does not apply in the context of civil rights. And what happens is the court invites opposing individuals out of their dedication to their professionalism, their nobility to the profession, like Mr. Ridge. It asks them. It makes them an offer that ... They can refuse. That they can't refuse. There's somebody who really cares about the justice system. And he didn't. He deserves that, too. That's not ... The fact is, nevertheless, there's no money for anything. It's what Tavern teaches, what Boring versus Cusickiewicz teaches. There's no money for deputations. There's no money for executions. And one of the cases, Montgomery versus Pinchak, that reversed a decision not to appoint, using air quotes, counsel, did so because the court whipsawed the inmate plaintiff by saying he needed an expert medical witness to make out his Eighth Amendment denial of medical care claim. And he lost on summary judgment because he didn't have an expert witness. But by the same token, and I see Judge Greenway's nodding because he wrote an opinion in Howman, which is a non-presidential opinion, but nevertheless ... He's nodding to this while you speak. In any case, you can't whipsaw the fellow and then say you can't have counsel because you can handle this case on your own and then say you needed an expert because one of the things that an expert is supposed to do, or one of the things that appointed counsel is supposed to do, besides work for free and absorb the cost of the depositions, is find out a way to get the expert. And this court in Montgomery versus Pinchak, in a quote, says, it may not be easy for appointed counsel to get an expert, but they have a much better opportunity to do so than an indigent prisoner. Thank you very much, Mr. Thank you. I think I mispronounced your name. Is that Marichaly? It's Marichaly, Your Honor. Thank you, Your Honor. Because I think the court's covered most of them with Mr. Marichaly. Frankly, the reason that Gumbrevich elects to put Leonard Young in a restraint chair is at page 310 of your record. And it is, I then contacted Captain Workman and stated to him that I'd made the decision to place an inmate in a mobile restraint chair and place him in a POC cell, a psychiatric observation cell, as I did not want to return the inmate back to a cell pod where he had gotten several of the inmates screaming for him to injure staff. So it has nothing, and the reason that I dwell on the Department of Corrections regulations is, that tells you when you can use a restraint chair. This is clearly not one of those circumstances. So what's his motivation? Why is he using the restraint chair? He already has him in a psychiatric observation cell away from the pod. Yeah, but we're not strictly bound by those regulations, right? No, Your Honor. Okay. And so now it would appear that what you've just referred to is exactly the reason why it would be reasonable to put him in a restraint chair for some period of time because they were concerned about disturbance. Well, Your Honor, I think that would be a question of fact. The truth of the matter is because they did put him in a psychiatric observation cell off the pod. So he's not a danger to himself. He's not a threat to escape. He's not a danger to others, and he is, they have quelled the disturbance. So what's he going into a restraint chair for? And then why do they keep him there? Counsel, there's also the use in both instances of the spit mask. Right. What is in the record regarding any policy on the use of a spit mask? I don't know the answer to that question. Perhaps that would have been better. But I do know this much. When they put the spit mask on him, Leonard Young says, what are you putting a spit mask on me for? I didn't spit at anyone. He doesn't threaten to spit at anyone. I wanted to answer Judge Krause's question about judicial notice. I did not look at the issue of whether this court can take judicial notice, and it wasn't necessary to look at it at the trial court level because I believe that Rule 8038 gives us the ability to introduce that report. And you continue to press that argument now as to the final report? Yes. As to sections of it that may fit the definition under 803 of factual findings? I don't think there's any question about that. I mean, the way the rule reads and the way the Department of Justice practices their report, they say, we were mandated by Congress to conduct an investigation under CREPA into the excessive use of force for institutionalized persons. And then they do it. To me, that's exactly what 8038 is talking about. That's why it prefaces it by saying, are you required by law to do this review? And that's why I believe that the rule would be admissible or, I'm sorry, the report would be admissible and we'd be able to introduce it at trial. Thank you. Thank you for your time. Thank you.